**IN THE COURT OF APPEALS OF IOWA**

No. 18-1235
Filed November 30, 2020


IN THE MATTER OF THE GUARDIANSHIP AND CONSERVATORSHIP OF
MARVIN M. JORGENSEN,

**ROXANN WHEATLEY, RICK WHEATLEY, and DALLAS WHEATLEY,**
      Appellants.
_____


Appeal from the Iowa District Court for Audubon County, Kathleen A.
Kilnoski, Judge.


Appellants appeal the district court's order modifying farm leases.
**AFFIRMED IN PART AND REVERSED IN PART.**


Eldon L. McAfee, Julia L. Vyskocil, and Daniel P. Kresowik of Brick Gentry,
P.C., West Des Moines, for appellants.

Deborah L. Petersen of Petersen Law PLLC, Council Bluffs, for appellee
Michael Jorgensen.

Alexander E. Wonio of Hansen, McClintock & Riley, Des Moines, for
appellee Mark Jorgensen.

Lyle W. Ditmars and Leo P. Martin of Peters Law Firm, P.C., Council Bluffs,
attorney and guardian ad litem for Marvin M. Jorgensen.


Heard by Bower, C.J., and May and Greer, JJ.

**MAY, Judge.**

This case involves farm land owned by Marvin Jorgensen. After Jorgensen suffered a stroke in October 2016, a conservator took over management of his land. A key task for the conservator was to sort out all of Marvin's oral leases and convert them to written leases. This task proved to be difficult. Ultimately, though, Marvin's tenants executed written leases. Later, two of Marvin's children sought intervention from the district court to resolve various alleged errors and other issues concerning the written leases. The district court issued an order modifying the leases. This appeal followed.[1]

## I. Background Facts and Proceedings

Marvin Jorgensen owns around 18,000 acres of Iowa agricultural land. He has three children: Mark Jorgensen, Michael Jorgensen, and Roxann Wheatley. Marvin leased roughly half the land to his children and other family members—including Rick Wheatley, Roxann's husband; Dallas Wheatley, Roxann's son; and another grandson. The rest of the land was leased to other non-family members. All the leases were oral. There is no written record for any of these agreements. It is known, though, that Marvin rented land to his family members at discounted rates.

In October 2016, Marvin had a stroke that left him incapable of managing his affairs. Mark was Marvin's power of attorney. In December, Marvin signed a

---

[1] The appellants in this case are Roxann Wheatley, Rick Wheatley, and Dallas Wheatley (the Wheatleys). The appellees include Michael Jorgensen, Mark Jorgensen, and Marvin's guardian ad litem (GAL).

voluntary petition[2] to appoint Roxann as his guardian and Roxann and Security National Bank (SNB) as his co-conservators. Mark, as the power of attorney, filed a motion to intervene and resisted the appointments.

In January 2017, the family members and SNB resolved their differences by entering an agreement entitled the "Family Settlement Agreement." Under this agreement, SNB would be appointed as Marvin's sole conservator and Roxann would be appointed his guardian.

The Family Settlement Agreement also created the "Family Council," consisting of Michael, Mark, and Roxann. The Family Council agreed to "give guidance and assistance to SNB in discharging its duties." And SNB agreed to give "due deference . . . as to matters and issues on which the family council unanimously consents . . . provided they do not contravene Marvin's intent, or SNB's fiduciary duties." SNB also agreed to "take into consideration [Marvin]'s past course of dealings with his children and their family members" when determining Marvin's intent.

A recommendation by the Family Council was attached to the Family Settlement Agreement. It was entitled "Family Recommendation to Conservator" (Family Recommendation). In it, Roxann, Michael, and Mark "ma[d]e the following recommendation to the [c]onservator":

---

[2] More than one party has suggested that this "voluntary petition"—filed months after a stroke left Marvin incapable of managing his affairs—was not wholly proper. But that issue is not before us.

1. All current farm leases will remain in effect.
2. All farm leases shall be extended to the year 2030;
3. Rents will be calculated at the Iowa State University cash rent for medium quality ground, effective March 1, 2018 less $40 per acre as per past course of dealing.

Roxann, Michael, and Mark all signed the Family Recommendation.

On January 31, Marvin's then-GAL[3] filed an application asking the district court to approve the Family Settlement Agreement. The GAL attached the Family Settlement Agreement—including the Family Recommendation—to the application. No one filed an objection or requested a hearing. In February, the court entered an order approving the Family Settlement Agreement.

In May, SNB filed an application for the court to enter an order "authorizing and directing" SNB to "execute and enter into any and all agreements, leases[,] and instruments, and to perform all other acts necessary or appropriate to manage" Marvin's "farm land." No one filed an objection or requested a hearing. But Marvin's then-GAL filed an "answer" to SNB's application. It stated, in pertinent part:

3.  The conservator's requests appear to be appropriate, genuine and in the best interest of the proposed ward.

4.  In the opinion of the undersigned, it would be in the best interests of the proposed ward to authorize the Conservator to perform the acts requested in said applications as long as the Conservator gives appropriate consideration to the family settlement agreement filed herein on January 31, 2017 and exercises such authority in accordance with their fiduciary duty to the ward.

---

[3] Different GALs have served Marvin at different periods.

On June 2, the court entered an order "authorizing management of farm land." It stated, in pertinent part:

> NOW THIS MATTER comes on for hearing upon the Application of Security National Bank, conservator herein, for the authority to execute and enter into any and all agreements, leases and instruments, and to perform all other acts necessary or appropriate to manage the ward's farm land, and to pay all landlord expenses associated with the farms.
>
> THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:
>
> 1. The conservator is authorized and directed to execute and enter into any and all agreements, leases and instruments, and to perform all other acts necessary or appropriate to manage the ward's farm land.

In August and September, SNB acted on this authority by entering various leases with family members. SNB agreed to a rate of $40 per acre below the Iowa State University cash rental rate (ISU rate).[4] SNB also agreed the leases should remain in effect until 2030. Both terms were consistent with the Family Recommendation that had been signed by the Family Council.

Months passed. Then, in February 2018, SNB filed an "Application for Review of Family Farm Leases." It noted that several disputes had arisen between SNB and the family members. It asked for the court to take several steps, including either "[a]djusting the [f]amily [l]eases to fair market value or confirm[ing] the

---

[4] The ISU rate is determined from "a survey of farmers, landowners, agricultural lenders, and professional farm managers," who "suppl[y] information based on their best judgments about typical cash rental rates for high, medium, and low quality cropland in their counties." *Cash Rental Rates for Iowa 2019 Survey*, Iowa State University Extension and Outreach, https://www.extension.iastate.edu/agd m/wholefarm/html/c2-10.html.

reduced lease values in accordance with the [w]ard's past course of dealing and recommendations of the Family Council."

Also in February, Mark and Michael filed a motion requesting the district court review the management of Marvin's assets. It included several complaints.[5] Important here, Mark and Michael complained about management of Marvin's land. They noted alleged discrepancies in the leases, concerns that the leases did not actually reflect Marvin's past course of dealings, the potential need for a farm manager, and more.

Following a hearing, the district court entered an order that directed, among other things: (1) SNB should remain the conservator, (2) the Family Council is dissolved, (3) Farmers National Company (FNC) should be appointed as a farm manager, (4) the family members' leases should be revised, and (5) the family discounted rent rate should be $25 under the market value per acre. SNB and the Wheatleys filed motions to reconsider, amend, or enlarge. Following a second hearing, the court denied those motions. The Wheatleys now appeal.

## II. Analysis

The Wheatleys contend the district court lacked the authority to modify the leases. So the Wheatleys ask that we (1) "reinstate the Wheatleys' original rents under the leases"; (2) "reinstate the Wheatleys' original lease terms, which were to be extended to the year 2030"; (3) "reinstate the Wheatleys' original lease terms with regard to subleasing rights"; and (4) "rescind reformation of Dallas Wheatley's

---

[5] For example, although Marvin had "amassed" a "fortune" before his stroke, Mark and Michael complained that Marvin's money should not be wasted on "a double room at the nursing home." Instead, they thought Marvin "should be moved . . . into a one-bedroom as soon as practical."

lease removing the Chappel Farm and add[ing] it to Michael's lease." At the same time, though, the Wheatleys also ask this court to (5) "reform Michael's lease to remove the Corning Farm and add it to Dallas's lease, consistent with Marvin's stated intent." Michael, Mark, and the current GAL resist these requests. They assert the district court correctly resolved all issues.

Because this is an equity case, our review is de novo. *Garland v. Branstad*, 648 N.W.2d 65, 69 (Iowa 2002); *accord* Iowa R. App. P. 6.907.

As noted, the family lease contracts were the product of an elaborate, multi-step process. First, Michael, Mark, Roxann, and SNB entered the Family Settlement Agreement. Pursuant to that agreement, Michael, Mark, and Roxann signed the Family Recommendation and submitted it to SNB. The Family Recommendation expressly recommended that SNB should allow all farm leases to remain in effect, extend all leases to the year 2030, and calculate the rents at $40 below the ISU rate per acre.

Then Marvin's GAL asked the district court to approve the Family Settlement Agreement—to which the Family Recommendation was attached. The district court did so. And then the district court authorized SNB "to execute and enter into any and all agreements, leases and instruments, and to perform all other acts necessary or appropriate to manage the ward's farm land." *See* Iowa Code § 633.647(2) (2017) (requiring a conservator to obtain court approval to execute leases). With this authorization in hand, SNB executed the family leases at issue.

Now the question is this: Was it right for the district court to later modify those lease contracts[6] or, in the case of the Corning Farm, to decline to modify the leases? In considering this question, we begin with the understanding that courts should not make contracts "the parties did not make." *Smith v. Stowell*, 125 N.W.2d 795, 798 (Iowa 1964); *see Lockie v. Baker*, 218 N.W. 483, 485 (Iowa 1928) (noting "a court of equity does not undertake to make a contract for the parties or to supply any essentials thereof"). Nor should we change the parties' chosen contractual terms "and read into [a] contract other terms which were not agreed upon" when the contract was made. *Fairgrave v. Illinois Bankers' Life Ass'n of Monmouth, Ill.*, 233 N.W. 714, 717 (Iowa 1930). Instead, we generally enforce written contracts as they are written. *See Greene v. Heithoff*, No. 10-1608, 2011 WL 5515167, at *7 (Iowa Ct. App. Nov. 9, 2011) ("Since time immemorial, the law of contracts provides that parties are entitled to bargain freely and that their agreements will be enforced in a court of law. Subject to narrow exceptions . . . courts do not modify the terms of the contract or use judicial creativity to supply terms that are absent from the written agreement. Courts generally enforce contracts as written, plain and simple." (omission in original) (citation omitted)).

But the district court noted that, under Iowa Code section 633.641, the conservator has a duty to "protect and preserve" an estate. The court further noted *its* duty to supervise the administration of a conservatorship and act in the best

---

[6] In this appeal, we only consider the modifications of which appellants complain, namely: (1) changing the Wheatleys' rents; (2) changing the Wheatleys' original lease terms; (3) changing the Wheatleys' subleasing rights; and (4) changing Dallas Wheatley's lease by "removing the Chappel Farm and add[ing] it to Michael's lease."

interest of the estate. The court believed these grounds justified modifications of the leases.

We disagree. Like all statutes, we find the meaning of section 633.641 in the "'text of the statute,' the 'words chosen by the legislature.'" *Fishel v. Redenbaugh*, 939 N.W.2d 660, 663 (Iowa Ct. App. 2019) (quoting *State v. Childs*, 898 N.W.2d 177, 184 (Iowa 2017)). Section 633.641 is entitled "Duties of conservator." It states:

> It is the *duty of the conservator* of the estate to protect and preserve it, to invest it prudently, to account for it as herein provided, and to perform all other duties required of the conservator by law, and at the termination of the conservatorship, to deliver the assets of the ward to the person entitled thereto.
>     The conservator shall report to the department of human services the assets and income of any ward receiving medical assistance under chapter 249A. Reports shall be made upon establishment of a conservatorship for an individual applying for or receiving medical assistance, upon application for benefits on behalf of the ward, upon annual or semiannual review of continued medical assistance eligibility, when any significant change in principal or income occurs in the conservatorship account, or as otherwise requested by the department of human services. Written reports shall be provided to the department of human services county office for the county in which the ward resides or the county office in which the ward's medical assistance is administered.

Iowa Code § 633.641 (emphasis added).

As its words make clear, section 633.641 only addresses the *duties* of the conservator. *See id.* It does not mention any *power* of the district court. *See id.* It does not *authorize* the district court to modify any contract.[7] Rather, where—as here—the court has previously authorized the conservator to execute leases

---

[7] The parties have not cited, and we have not found, any authority for the proposition that Iowa Code section 633.641 authorized the modifications at issue here.

pursuant to section 633.647, the resulting leases are binding as written. *Cf. In re Estate of Harker*, 85 N.W. 786, 787 (Iowa 1901) ("As to the contention that appellant may have relief on the ground that she was a minor when the contract was made, it is sufficient to say that the signing of the contract for her by her guardian under the direction of the probate court made the contract as binding and conclusive with reference to her as if she had been an adult at the time of its execution, and signed it in person.").[8]

And so our interpretation of section 633.641 begins and ends with its words. We note, however, that our reading of section 633.641 is not inconsistent with the best interests of wards like Marvin. Assuming a ward's best interest is represented during the formation of contracts—including leases—enforcement of those contracts should also be consistent with the ward's best interest.[9]

And, indeed, Marvin's best interest was represented throughout the process that led to the leases. For one thing, SNB was acting as Marvin's conservator—a

---

[8] We have considered all of the caselaw cited by the parties. We find none of it supports the contention that we may abandon our strict contract-enforcement rules and substitute the desire to preserve the ward's best interests to warrant modification of a valid agreement. *See In re Brice's Guardianship*, 8 N.W.2d 576, 579 (Iowa 1943) (holding Iowa Code section 12581 (1939) authorizes the district court to provide for an allowance to a ward's relative that the ward was not legally obligated to provide for); *Haradon v. Boardman & Cartwright*, 294 N.W. 770, 774–75 (Iowa 1940) (discussing the district court's jurisdiction in a guardianship manner); *Bates v. Dunham*, 12 N.W. 309, 310 (Iowa 1882) (providing a guardian must act under the discretion of the district court).

[9] We note Mark and Michael's argument that "a finding" that the district court cannot rewrite the leases "encourages deceitful profiteering at the expense of ill-informed and unsuspecting [c]ourts, conservators[,] and those tasked with protecting the [w]ard and those similarly situated." But it is the duty of conservators and others "tasked with protecting the [w]ard" to *front-load* their due diligence inquiries and *become* informed *before* they seek court-approval for—or actually enter—leases on behalf of wards.

fiduciary with the "duty" to "protect and preserve" Marvin's estate—when SNB asked the district court for authority to enter leases with family members. Iowa Code § 633.641. SNB also acted as Marvin's conservator when SNB actually entered the family leases.

Moreover, Marvin was represented by a GAL, who was charged with protecting Marvin's best interest. *See Estate of Leonard, ex rel., Palmer v. Swift*, 656 N.W.2d 132, 140 (Iowa 2003) (discussing the role of a guardian ad litem). The Family Settlement Agreement expressly identified Marvin's GAL as Marvin's legal representative. Marvin's GAL signed the Family Settlement Agreement, approving it as to form. Then Marvin's GAL submitted the Family Settlement Agreement— including the Family Recommendation—to the district court for approval. Later, when SNB filed an application for authority to enter the leases at issue, Marvin's GAL told the district court that SNB's requests "appear to be appropriate, genuine and in the best interest" of Marvin. The GAL also told the district court "it would be in the best interest[]"[10] of Marvin to authorize SNB to enter leases assuming that, among other things, SNB "give[s] appropriate consideration to the family settlement agreement filed herein." *Cf.* Iowa Code § 633.652 (addressing a conservator's power to lease real property belonging to the ward "*when it appears to be* in the best interests of the ward" (emphasis added)).

---

[10] We recognize that Marvin's successor GAL views things differently. But that does not mean the prior GAL was wrong. We also agree with the Wheatleys' concerns about allowing successor GALs to undo contractual arrangements authorized by a prior GAL and the district court. As the Wheatleys put it, if we allowed such revisions, "no written agreement entered into by a [c]onservator with court authority for execution could ever be relied upon by the parties for fear that a successor GAL could be appointed and have a different viewpoint and seek to reform and/or terminate those agreements."

Even so, Marvin's current GAL suggests SNB lacked "sufficient prior court approval to enter into the leases." As support, the GAL quotes Iowa Code section 633.647, which provided:

Conservators shall have the following powers subject to the approval of the court after hearing on such notice, if any, as the court may prescribe:
    1. To invest the funds belonging to the ward.
    2. To execute leases.
    3. To make payments to, or for the benefit of, the ward in any of the following ways:
        a. Directly to the ward.
        b. Directly for the maintenance, welfare, and education of the ward.
        c. To the legal guardian of the person of the ward.
        d. To anyone who at the time shall have the custody and care of the person of the ward.
    4. To apply any portion of the income or of the estate of the ward for the support of any person for whose support the ward is legally liable.
    5. To compromise or settle any claim by or against the ward or the conservator; to adjust, arbitrate, or compromise claims in favor of or against the ward or the conservator.
    6. To make an election for the ward who is a surviving spouse as provided in sections 633.236 and 633.240.
    7. To exercise the right to disclaim on behalf of the ward as provided in section 633E.5.
    8. To do any other thing that the court determines to be to the best interests of the ward and the ward's estate.

Although the GAL quotes the statute and underlines some of its words ("subject to the approval of the court after hearing"), the GAL says little more about how we should interpret section 633.647. Clearly, though, it is the GAL's position that, because the district court did not hold an evidentiary "hearing" before issuing the June 2017 order authorizing SNB to enter leases, SNB *was not* authorized to enter leases. And so the argument goes, the leases were subject to later judicial revision.

We agree that, by its plain terms, section 633.647 anticipates "approval" of conservator action will occur "after" a "hearing" of some kind. So we assume without deciding that entry of the June 2017 order without a formal hearing may have been a procedural misstep—even though it appears no one requested a hearing and, after the order was entered, it appears no one immediately requested reconsideration.

In any event, not every procedural misstep will invalidate an otherwise appropriate judicial act. So even if the district court should have held a formal hearing before issuing the June 2017 order, it does not automatically follow that (1) the June 2017 order was invalid, (2) SNB should not have treated the order as valid, (3) the leases entered pursuant to the June 2017 order were invalid, or (4) those leases were subject to later judicial modification. Nothing in section 633.647 requires any of those four conclusions.[11] Nor does the GAL provide arguments or authorities to support any of those four conclusions. So we decline to adopt them. Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."); *see State v. Gibbs*, 941 N.W.2d 888, 902 (Iowa 2020) (McDonald, J., specially concurring) ("The failure to make more than a perfunctory argument constitutes waiver.").

---

[11] Section 633.647 is silent as to what consequences follow if the court authorizes action without first conducting a formal hearing. Based on the record and briefing, we find no reason to fill that silence. After all, "[a] matter not covered in a statute is not covered." *In re Myers*, 874 N.W.2d 679, 681–82 (Iowa Ct. App. 2015) (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012) (discussing omitted-case canon)). "The matter may not be added by interpretation." *Id.*

Moreover, in our de novo review, we again note that Marvin was represented by a GAL at the time SNB requested authorization to enter leases. Marvin's then-GAL responded to the request by filing an "answer." The answer did not request a hearing. Instead, the answer told the district court that SNB's requests "appear to be appropriate, genuine and in the best interest of the [] ward." We read the answer as a "green light" for the court to grant SNB's requests without further proceedings.

Marvin's current GAL also suggests that, even if SNB was authorized to enter leases, SNB was not authorized to enter leases *at discounted rates*. The GAL relies on Iowa Code section 633.668, which provides:

> For good cause shown and under order of court, a conservator may make gifts on behalf of the ward out of the assets under a conservatorship to persons or religious, educational, scientific, charitable, or other nonprofit organizations to whom or to which such gifts were regularly made prior to the commencement of the conservatorship, or on a showing to the court that such gifts would benefit the ward or the ward's estate from the standpoint of income, gift, estate or inheritance taxes. The making of gifts out of the assets must not foreseeably impair the ability to provide adequately for the best interests of the ward.

The GAL claims that offering discounted rates to family members constituted "gifts" for purposes of section 633.668. And, the GAL argues, "[t]he June 2, 2017 [o]rder did not make the necessary specific findings or contain an authorization to make gifts which is required by Iowa Code [s]ection 633.668."[12]

---

[12] The GAL makes similar complaints about the district court's order of April 27, 2018, from which this appeal was taken. The GAL asks us to determine whether the discounted rate approved in that order ($25 under market value) is an appropriate gift under section 633.668. But the GAL took no appeal or cross-appeal from the order of April 27, 2018. So we decline the GAL's request for additional relief.

So, the GAL contends, SNB lacked authority to enter the leases *notwithstanding* the court's order authorizing SNB to enter leases.

We disagree. To begin with, it is not obvious that discounted rent rates constitute "mak[ing] gifts . . . *out of* the assets under a conservatorship" as contemplated by section 633.668. (Emphasis added.) While discounted rates forgo some income, they do not directly expend the ward's "assets" in the same way that charitable gifts usually do. And the GAL cites no authority to show that offering a discount represents a gift for purposes of section 633.668. *See* Iowa R. App. P. 6.903(2)(g)(3).

Even assuming section 633.668 applies, we disagree that it required the district court to include "specific findings"—or, indeed, any particular language—in the June 2017 order. Although section 633.668 requires an "order of court," it does not specify the contents of the order. And the GAL offers no authority to show that section 633.668 requires specific findings. *See* Iowa R. App. P. 6.903(2)(g)(3). So we conclude that—*unlik*e many *other* statutes that expressly require specific findings or other language in court orders—section 633.668 does not. *Compare* Iowa Code § 633.668, *with id.* §§ 598.21(8) ("Orders made pursuant to this section . . . shall contain the names, birth dates, addresses, and counties of residence of the petitioner and respondent."), .41(5)(a) ("If the court denies the request for joint physical care, the determination shall be accompanied by specific findings of fact and conclusions of law that the awarding of joint physical care is not in the best interest of the child."), 625A.9(2)(a)(2) ("The court may set a bond in an amount in excess of one hundred ten percent of the amount of the money judgment upon making specific findings justifying such an amount . . . ."), 814.11(5) ("The order of

appointment shall include a specific finding that no contract attorney is available and the state public defender consents to the appointment."), 822.7 ("The court shall make specific findings of fact, and state expressly its conclusions of law, relating to each issue presented."), 915.38(1)(a) ("However, such an order shall be entered only upon a specific finding by the court that such measures are necessary to protect the minor from trauma.").

Also we agree with the Wheatleys that—even assuming the rent discounts constitute gifts—they were not unlawful. Section 633.668 permits "gifts . . . to persons . . . to whom or to which such gifts were regularly made prior to the commencement of the conservatorship," provided the gifts do "not foreseeably impair the ability to provide adequately for the best interests of the ward." The record shows that Marvin's family members were "persons" to whom he had "regularly" provided rent discounts prior to the conservatorship. And given Marvin's extensive assets, we find no reason to fear the rent discounts would "foreseeably impair the ability to provide adequately for the best interests of the ward." So the substantive requirements of section 633.668 were met.

In summary, then, we see no *statutory* grounds to conclude the leases were improperly entered or, in any event, were subject to judicial revision in April 2018. Like the parties, though, we recognize that—under limited circumstances—*contract law* sometimes permits courts to reform written contracts, including leases.[13] *See Kansas v. Nebraska*, 574 U.S. 445, 470 (2015) (noting "courts

---

[13] The GAL also mentions the possibility of rescission. But the GAL concedes that the "law relating to rescission is very similar" to the law governing reformation. The GAL also advises us that the distinction between reformation and rescission is

should hesitate, and then hesitate some more, before modifying a contract, even to remove an inadvertent flaw").

But "[r]eformation of written instruments may be granted only upon clear, satisfactory, and convincing evidence of fraud, deceit, duress, or mutual mistake." *See* Iowa R. App. P. 6.904(3)(k); *see Gouge v. McNamara*, 586 N.W.2d 710, 714 (Iowa Ct. App. 1998) ("Clear and convincing proof of the grounds for reformation is required to help ensure a court granting reformation is merely changing the terms of a written document to reflect the agreement of the parties and not making a new agreement."). And reformation should only be allowed when "a written agreement . . . fails to reflect the 'true agreement' between the parties." *See Peak v. Adams*, 799 N.W.2d 535, 545 (Iowa 2011). Before reformation can occur,

> a definite intention or agreement on which the minds of the parties had met must have preexisted the instrument in question. There can be no reformation unless there is a preliminary or prior agreement, either written or verbal, between the parties, furnishing the basis for rectification or to which the instrument can be conformed.

*Id.* (citation omitted).

So, even when reformation is allowed, "the court does not change the agreement between the parties." *Wellman Sav. Bank v. Adams*, 454 N.W.2d 852, 855 (Iowa 1990). Rather, the court only "changes the drafted instrument to conform to the real agreement." *Id.*; *see Costello v. Stokely Grain Co.*, 186 N.W. 842, 844 (Iowa 1922) ("The purpose in reforming a contract is to effectuate justice and to express the true intention of the parties."); *see also SDG Macerich Props., L.P. v. Stanek Inc.*, 648 N.W.2d 581, 588 (Iowa 2002) ("It is only in rare cases

---

"more a matter of semantics than substance." Given the briefing and record, we conclude that—just as reformation is not appropriate—neither is rescission.

where one or more of these factors is at play that courts will abandon strict construction of a written agreement.").

Here, the district court made no findings that would support modification. For example, the district court made no finding of fraud or misrepresentation in the crafting of the leases.

Even so, as part of our de novo review, we have considered the modification issue. As noted, the first question is whether there is "clear, satisfactory, and convincing evidence of fraud, deceit, duress, or mutual mistake" in the process that led to the family leases. *See* Iowa R. App. P. 6.904(3)(k). From our review of the briefs and the record, we have no "clear, satisfactory, and convincing" evidence of "fraud, deceit, duress, or mutual mistake" as to most of the lease features raised in this appeal, namely, the term of the Wheatleys' leases, the Wheatleys' subleasing rights, the Chappel Farm, and the Corning Farm.

We recognize, though, there is substantial controversy as to the rent discounts. But from our review, we do not find "clear, satisfactory, and convincing evidence" that the Wheatleys' rate discount was the product of "fraud, deceit, duress, or mutual mistake."

Because of Marvin's "handshake" style of doing business, the parties can offer no records as to what rates he charged.[14] And none of Marvin's family

---

[14] On behalf of SNB, Dylan Dynkla testified:
> Q. When the conservator was appointed, what, if any, written leases were there involved in this matter? A. There was no written terms of any kind.
> Q. So all the farm ground was rented by oral agreement? A. Yes.
> Q. A handshake? A. Yes.

members knew what Marvin charged other family members. As noted though, it is clear Marvin provided discounts to family members. And Mark, Michael, and Roxann agreed—and put down in writing, through the Family Recommendation—that $40 per acre below the ISU rate was an appropriate rate "as per past course of dealing." For sure, that rate provides a substantial discount. But it is not clearly and convincingly implausible given the present record. The ISU rate is "the standard" rate used by Iowa fiduciaries for renting farm ground.[15] And Roxann testified that, in her conversations with Marvin, he had envisioned his family getting "a reduced rate, up to fifty bucks" off of their rent.[16] And based on our de novo

---

Q. And the ward had taken care of all of that by himself? A. Yes.

[15] In his testimony, SNB representative Dylan Dynkla explained:

Q. Okay. And Iowa State's survey, how is that viewed in your business in terms of establishing rates? A. *That's the standard for most fiduciaries that are dealing with farm ground.* By and large *that's the default position for rent.*

Q. Okay. And do you also consider neighboring farms and what the other tenants that are non-elated might be paying? A. In my experience generally not, not as much as the Iowa State survey. *The Iowa State survey is the one that carries.*

(Emphasis added.)

Dinkla also sometimes used the ISU rate interchangeably with "market value."

Q. Now, are [the Wheatleys], are they receiving a benefit of the reduced *fair market value* for leasing the farm ground? A. Yes, the $40 an acre off.

Q. Now, with the farm lease they also identified a base amount to determine the cash rent, and that's based on an Iowa State average survey for farm ground, wasn't it? A. The Iowa State manual survey.

Q. All right. So the conservatorship, with the family agreement, went out to obtain what the family agreed to be *the fair market value* and reduced it by the $40 per acre? A. Yes.

(Emphasis added.)

[16] We acknowledge Marvin charged much more for non-family members. It is not uncommon, though, for people to treat family members differently than non-family

review, we conclude appellees have provided no compelling reasons to treat Roxann's testimony as false.

We recognize that Mark and Michael now claim they were being untruthful when they signed the Family Recommendation. They now say that, even for family members, Marvin did not envision rent as low as $40 below the ISU rate. But we struggle to conclude Mark and Michael's new position—their "attack of conscience," as they put it—provides a reliable basis for decision-making. We decline to treat their change of heart as "clear, satisfactory, and convincing evidence" of what rates Marvin charged the Wheatleys[17] in the past or would have charged them in the future.

We have also considered both the record evidence and the district court's findings concerning Marvin's interactions with management companies. As the district court found, Marvin interviewed two different farm-management services: Wells Fargo and Farmers National Company. Marvin discussed with Farmers National Company "creating cash rent leases at market rate, with a discount of $25 per acre for his family tenants." And Farmers National Company sent Marvin written proposals that were consistent with those discussions. No one claims, though, Marvin actually entered an agreement with any management company, much less Farmers National Company. So we think their discussion should be treated as just that—a discussion. We do not consider it "clear, satisfactory, and

---

members. Indeed, everyone agrees Marvin provided *some* discount for family members. The only question is how much.

[17] We again note that no family members knew what rates Marvin charged other family members.

convincing evidence" of "fraud, deceit, duress, or mutual mistake" as to what rate should be stated in the Wheatleys' leases.

All things considered, we find no "clear, satisfactory, and convincing evidence" that the Wheatleys' rent rates resulted from "fraud, deceit, duress, or mutual mistake." So the first essential requirement of reformation has not been met.

Even if that first hurdle had been cleared, another obstacle would block the way. As noted, reformation could be appropriate only if the rent rate in the Wheatleys' leases conflicted with the parties' actual "preliminary or prior agreement" concerning rent rates. *Peak*, 799 N.W.2d at 545. This element, too, must be proven by "clear, satisfactory, and convincing proof." *Clinton Police Bargaining Unit v. City of Clinton*, No. 08-0063, 2009 WL 249664, at *2 (Iowa Ct. App. Feb. 4, 2009) ("The bargaining unit was obligated to establish by clear, satisfactory, and convincing proof that there was such a preexisting agreement.").

But the parties agree[18] the only preliminary agreement was the Family Settlement Agreement. And the parties have shown no conflict between the rent rate in the leases and the rent rate called for by the Family Settlement Agreement. Indeed, the rent rate in the leases *is the same* rent rate contained in the Family Recommendation—which was prepared in compliance with the Family Settlement Agreement and has been treated as part of the Family Settlement Agreement.

---

[18] The Wheatleys' brief states: "Here, the only preliminary agreement to the leases was the Settlement Agreement and the Family Counsel Recommendation." The GAL states: "In this case, the actual 'agreement' was the Family Settlement Agreement."

It is true that, in the Family Settlement Agreement, SNB also agreed to "conduct its duties consistent with Marvin's intent" and, "[i]n determining Marvin['s] intent," to "take into consideration" Marvin's "past course of dealing with his children and their family members." But these are very general terms. They do not specifically address the Wheatleys' rent rate. And, in our de novo review, we cannot conclude they reflect a "*definite* intention or agreement on which the minds of the parties had met" concerning the Wheatleys' rent rate. *See Peak*, 799 N.W.2d at 545 (emphasis added). If anything, they point our attention back to the Family Recommendation, through which Marvin's children recommended a specific rent rate—the ISU rate less $40—"as per past course of dealing." If there was any "definite intention or agreement on which the minds of the parties had met" concerning the Wheatleys' rent rate, it was the rate found in the Family Recommendation. And that same rate was included in the Wheatleys' leases.

Following our de novo review, we find grounds for modification have not been demonstrated by "clear, satisfactory, and convincing evidence." *See* Iowa R. App. P. 6.904(3)(k). So we reverse as to the modifications complained of in the Wheatleys' brief, namely: (1) the rent rates for the Wheatleys' leases, (2) the duration period of the Wheatleys' leases, (3) prohibiting for-profit subleasing in the Wheatleys' leases, and (4) removing Chappel Farm in its entirety from Dallas's lease and adding it to Michael's lease.[19] At the same time, because we find

---

[19] A portion of Chappel Farm and a portion of Snake Farm were enrolled in the Crop Reserve Program (CRP), which is a federal government program focused on land conservation. Dallas leased the remaining parts of both Chappel Farm and Snake Farm that were not enrolled. In 2018, the land was coming out of the program. The parties sought court guidance on determining the tenant of the CRP

grounds for modification have not been shown, we decline to order the modification requested by the Wheatleys, namely, reformation of Michael's lease regarding the Corning Farm.

### III. Conclusion

We reverse the district court's order insofar as it: (1) modifies the rent rates for the Wheatleys' leases, (2) modifies the duration of the Wheatleys' leases, (3) prohibits for-profit subleasing in the Wheatleys' leases, (4) removes Chappel Farm from Dallas's lease, and (5) adds Chappel Farm in its entirety to Michael's lease. We affirm in all other regards.

**AFFIRMED IN PART AND REVERSED IN PART.**

---

land. The district court ordered all of Snake Farm be included in Dallas's lease and all of Chappel Farm be included in Michael's lease.